AO 91 (Rev. 08/09) Criminal Complaint         AUSA Karen L. Atkinson

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED by _____ D.C.

MAY 26 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| GUILMENE ALTIDOR and | ) | Case No. 11-8186-JMH |
| MACKENSON FRANCOIS | ) | |
| | ) | |
| | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 25, 2011__ in the county of __Palm Beach__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1);<br>21 U.S.C. Section 841(b)(1)(B);<br>21 U.S.C. Section 846 | did knowingly and intentionally attempt to possess with intent to distribute a controlled substance, that is, in excess of 500 grams of cocaine. |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

CHRISTOPHER BROEDELL, TFO, DEA
Printed name and title

Sworn to before me and signed in my presence.

Date: 5/26/11

_____
Judge's signature

City and state: West Palm Beach, FL      U.S. Magistrate Judge James M. Hopkins
                                          Printed name and title

# **AFFIDAVIT**

I, Christopher Broedell, a Task Force Officer with the United States Drug Enforcement Administration (DEA), United States Department of Justice, (the affiant) having been duly sworn, depose and state:

1. I am a deputized Task Force Officer and "law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am, therefore, an officer who is empowered to conduct criminal investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

2. Your affiant, Christopher Broedell, is a sworn police officer with the Tequesta Police Department (TPD), and has served in that capacity since 2005. Your affiant is currently assigned to the DEA Task Force in West Palm Beach, FL and has been assigned to the DEA Task Force for approximately one year. Your affiant has successfully completed the Criminal Justice Standards and Training Police Academy and is certified by the Criminal Justice Standards and Training Commission as a Law Enforcement Officer. Your affiant has received specialized training in DEA's Basic Narcotics Investigation School. Your affiant has conducted and participated in numerous narcotic and drug trafficking investigations. Your affiant has made numerous narcotic related arrests and is very familiar with street terminology and how controlled substances are packaged, sold, smuggled, and transported. Through investigations and training, your affiant has become familiar with narcotic trafficker's methods of operation including the distribution, storage, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. Your affiant is also aware that drug

1

traffickers often speak in guarded or coded language when discussing their illegal business in an effort to further prevent detection. I have also conducted investigations concerning the identification of co-conspirators through the use of telephone records and bills, financial records, drug ledgers, photographs, and other documents. I have also participated in the debriefings of many of those individuals arrested who later cooperated with the Government. I have directed and observed the direction of confidential informants and cooperating witnesses to successfully investigate narcotics enterprises by way of intelligence gathering, participation in consensual recordings, and monitored purchases of controlled substances. I have participated in the execution search warrants for controlled substances and related documents and have conducted surveillance in connection with narcotic investigations. My training and experience as a Tequesta Police Officer, along with conversations with other Federal, state and local investigators familiar with narcotics trafficking and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein. As the purpose of this affidavit is to set forth probable cause, I have not included all facts known to me regarding this case.

3. On May 20, 2011, TFO Rey Paniagua, while working in an undercover capacity was introduced to a black male who was later identified as Guilmene ALTIDOR, a/k/a Himberson. ALTIDOR was interested in purchasing cocaine from TFO Paniagua.

4. During this meeting ALTIDOR told TFO Paniagua that he used to obtained cocaine from a Mexican male by the name of "LOPEZ". TFO Paniagua told ALTIDOR that the price for a kilogram of cocaine was approximately $32,000 and that he would sell it to ALTIDOR for $30,000, so ALTIDOR could make some money. TFO Paniagua asked

ALTIDOR if he wanted the cocaine to cook it or for snorting. ALTIDOR told TFO Paniagua that he wanted to cook it. TFO Paniagua told ALTIDOR that if they did business that he did not want ALTIDOR to show up to the deal with his "homeboys."

5. TFO Paniagua asked ALTIDOR what he wanted. ALTIDOR told TFO Paniagua that he was interested in purchasing half a kilogram of cocaine today. TFO Paniagua told ALTIDOR that he did not break the kilograms of cocaine, but that if ALTIDOR was interested in purchasing smaller amounts he could put him in contact with someone. ALTIDOR asked TFO Paniagua what price he would give him (ALTIDOR) on five kilograms of cocaine. TFO Paniagua told ALTIDOR that the price would be $29,000 per kilogram. ALTIDOR asked TFO Paniagua that if he got three if he would give it to him for $29,000 per kilogram of cocaine. TFO Paniagua told ALTIDOR that he would give it to ALTIDOR for $29,500. ALTIDOR asked TFO Paniagua to sell it for $29,000 and TFO Paniagua agreed. ALTIDOR asked TFO Paniagua if we could do the deal on the same day. TFO Paniagua told ALTIDOR that he needed to go and talked to his associates first and then he would let ALTIDOR know when they could do the deal. TFO Paniagua told ALTIDOR not to bring anyone with him to do the deal. ALTIDOR told TFO Paniagua that if anyone comes with him it would be his cousin but that his cousin was a "pretty boy." TFO Paniagua then asked ALTIDOR for his telephone number and name. ALTIDOR provided TFO Paniagua with telephone number 561-574-8496 and with the name of "JIMMY." TFO Paniagua told ALTIDOR that he would be calling him back from a different number at a later time.

6. On May 23, 2011, at approximately 5:14 pm, TFO Paniagua placed a controlled telephone call to ALTIDOR at telephone number 561-574-8496. TFO Paniagua

3

instructed ALTIDOR to go to the store and purchase a new telephone in order to talk about business (referring to cocaine business) freely over the telephone.

7. On May 24, 2011, at approximately 5:00 pm, TFO Paniagua observed missed call from telephone number 561-452-6760. TFO Paniagua then placed a call to the above telephone number. The telephone was answered by ALTIDOR. ALTIDOR told TFO Paniagua that he ready to purchase a kilogram of cocaine. TFO Paniagua told ALTIDOR that he would have to call him back with a price, since it was one and not three like they originally had talked about. TFO Paniagua was not able to record this telephone call.

8. On the same date, at approximately 5:40 pm, TFO Paniagua placed a controlled telephone call to ALTIDOR at telephone number 561-452-6760. TFO Paniagua told ALTIDOR that the price for one kilogram of cocaine was going to be $30,000. TFO Paniagua told ALTIDOR that he would be given him a kilogram from a shipment of cocaine he had just received. ALTIDOR asked TFO Paniagua if they could do it after he got out of work today. TFO Paniagua told ALTIDOR that they (TFO Paniagua and associates) didn't do anything at night. ALTIDOR told TFO Paniagua that they could do it the following day. TFO Paniagua once again reminded ALTIDOR not to bring anyone with him. ALTIDOR told TFO Paniagua that it was going to be him and his cousin. TFO Paniagua agreed. TFO Paniagua asked ALTIDOR what time he would be ready. ALTIDOR told TFO Paniagua that he would be ready by 9:00 am. TFO Paniagua told ALTIDOR he would call ALTIDOR the following day.

9. On May 25, 2011, at approximately 10:45 am, TFO Paniagua placed a controlled telephone call to ALTIDOR at telephone number 561-452-6760. TFO Paniagua told ALTIDOR that he had to travel to Okeechobee to go pick up some food (referring to the

cocaine). TFO Paniagua asked ALTIDOR if he was ready. ALTIDOR told TFO Paniagua that he was going to call his cousin and he was going to go grab that (referring to the money) and that he (ALTIDOR) would call TFO Paniagua back.

10. On the same date, at approximately 11:05 am, TFO Paniagua received an incoming call ALTIDOR utilizing telephone number 561-452-6760. TFO Paniagua told ALTIDOR to go to El Bodegon Supermarket located at Military Road and Forest Hill Boulevard. ALTIDOR agreed to meet TFO Paniagua at the above location.

11. ALTIDOR made contact with the UC and advised him that he was in a silver BMW vehicle with his friend later identified as Mackenson FRANCOIS. ALTIDOR exited from the passenger side of the BMW and made contact with the TFO Paniagua. The driver exited from the vehicle and made contact with TFO Paniagua. TFO Paniagua, ALTIDOR and FRANCOIS walked to the back of the BMW and looked inside of the trunk. FRANCOIS lifted the cover to the spare tire. Under the cover was a white plastic shopping bag which contained United States currency. It was later determined that the bag contained $29,800 in USC. TFO Paniagua then walked back to his vehicle accompanied by ALTIDOR. At the vehicle TFO Paniagua removed a small back pack that contained a false kilogram of cocaine. The UC opened the small back pack and showed a portion of the false kilogram of cocaine to ALTIDOR. The false kilogram of cocaine in the backpack was further concealed in shoebox. ALTIDOR took the back pack from TFO Paniagua and opened the shoebox further to view the entire kilogram of false cocaine. TFO Paniagua told ALTIDOR to take the backpack back to the BMW, remove the cocaine, put the money inside of the back pack and return it to TFO Paniagua. ALTIDOR walked back to rear of the BMW. It appeared to TFO Paniagua that

ALTIDOR was showing the false cocaine to FRANCOIS at which time both subjects were arrested by agents. Both ALTIDOR and FRANCOIS were taken into custody and transported to the West Palm Beach Resident Office (WPBRO) for processing. During an inventory search of the vehicle TFO Sean Meyers discovered $29,800 US currency inside the trunk of the vehicle. TFO Mark Lucas discovered $13,000 US currency inside of a small box in the back seat of the BMW. TFO Sean Meyers further discovered a loaded Glock handgun concealed underneath the driver's side floor mat where FRANCOIS had been sitting.

12. At the West Palm Beach Resident Office (WPBRO) your affiant read ALTIDOR his "Advice of Rights" (DEA form 13). ALTIDOR stated he understood his rights and signed the portion of the DEA 13 waiving his Miranda rights.

13. During the interview, ALTIDOR stated that the money inside of the vehicle was not his and that it belonged to FRANCOIS. ALTIDOR stated that he was acting as a middle man for this narcotics transaction, introducing TFO Paniagua to FRANCOIS.

14. Following ALTIDOR's interview, agents began the interview of FRANCOIS. Your affiant read FRANCOIS his "Advice of Rights" (DEA form 13). FRANCOIS stated he understood his rights and signed the portion of the DEA 13 waiving his Miranda rights.

15. During the interview FRANCOIS stated that he picked up ALTIDOR from his residence and drove him to Forest Hill and Military Trail for the transaction. FRANCOIS stated $7,000 of the $29,800 discovered inside of the trunk to the BMW belonged to him. FRANCOIS stated he gave the money to ALTIDOR approximately six days ago as an investment. Following the sale of the cocaine, he was to receive his original $7,000 and an extra $1,000 as profit for contributing to the narcotics transaction. FRANCOIS stated

to your affiant that the loaded Glock handgun belonged to him. He had purchased it for protection following a burglary at his home.

FURTHER, YOUR AFFIANT SAYETH NAUGHT.

_____
Christopher Broedell, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this
_20_ day of May, 2011, upon a finding
of probable cause.

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 11-8186-JMH

UNITED STATES OF AMERICA

vs.

GUILMENE ALTIDOR and
MACKENSON FRANCOIS

**Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: /s/ Karen L. Atkinson
KAREN L. ATKINSON
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 178603
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: (561) 820-8711
Fax: (561) 820-8777
Karen.Atkinson@usdoj.gov